Okay, call the third case. People v. Illinois Commerce Commission. And who have we got here? Good morning, Your Honor. Christopher Turner with the Attorney General's Office with Petitioner People of the State of Illinois. Tom Stanton, Special Assistant Attorney General on behalf of the Illinois Commerce Commission. And James Goldschmidt for People's Gas. Good morning. Okay, well, try and be, I'm not going to say brief, but try to hone in on your arguments, because you missed the first one. The first one went for over an hour. So, with that, proceed. Christopher Turner Good morning, Your Honors. Counsel, may it please the Court. I am Christopher Turner of the Assistant Attorney General here on behalf of the Petitioner People of the State of Illinois. This Court should reverse the Illinois Commerce Commission's final order that approved Respondent People Gas's proposed system modernization program. Because that commission had ruled that Section 220.3 of Article 9 of the Public Utilities Act divests that commission of its ordinary authority to ensure that People's Gas's proposed program will result in just and reasonable natural gas rates. This is a direct review action that raises a narrow question of statutory construction, that is whether that provision, Section 220.3, provides a statutory rider through which the gas utilities may collect a surcharge for certain defined infrastructure costs. It was intended... So, you have just this conflict that you're trying to resolve, or you're trying to reconcile Article 8 provisions with Article 9 provisions, is that right? And it's your position that if we read Article 8, that certainly gives the commission the authority to reject in the first instance the modernization plan that's presented. Is that it? Correct, Your Honor. We believe that under Article 8, it has the authority to reject or modify. Here's what we ask them to modify that proposed program. And that's what the question is, is whether the General Assembly had intended through that Article 9 provision, Section 220.3, to foreclose the commission from exercising that authority under Article 8, its regular regulatory authority to modify People's Gas's program, particularly the pace of its spending, to ensure that it results in just and affordable natural gas services. We argue that it does not divest it of that authority and ask the Court to remand this. It's an administrative investigation back to the commission to simply determine how to exercise that authority. And in doing so, to address the Attorney General's principal argument. I want to just flip the words for one minute. As opposed to using the term divest, does it authorize? Does it authorize? Okay, Your Honor. Well, the question is Article 8 does authorize it to. Section 220 doesn't, 220.3 doesn't need to authorize them to do it. They are already authorized under Article 8, under Section 501. Under that provision, that provides sweeping authority for the commission to both investigate and determine whether or not the utility services and its practices are just and reasonable or unjust and reasonable. And if it finds that their practices or their operations, basically, their services and their practices are unjust, to determine what would be the just and reasonable services and to fix it by order. That was what they would be doing. That's why the commission instituted itself, it initiated, not the Attorney General or the other stakeholders, initiated this administrative investigation under Section 501, recognizing that sweeping authority. They did it in light of the history of cost overrun management problems with People, Gases Program. I'll call it the SMP. I don't like to use acronyms, but system modernization is going to get long. There was a history of cost overruns. It was in order for them to replace, originally just in order to replace their gas mains, the aging gas mains, to avoid future leaks and breakages. It's been going on since the 1980s, over decades. People, Gases expanded the program to cover other projects during that time. In 2009, they had given an estimate of the cost of $2.6 billion. By 2015, in the administrative proceedings over its acquisition by its current parent, it gave a $4.6 billion cost estimate. And then that same year, by the end of 2015, the commission's own independent auditor, Liberty Consulting, who looked at the program, disclosed an estimate of $8 billion for the program. And since then, outside experts have even given higher costs. It was in light of that audit, the reports by its auditor, about these cost overruns, about the lack of management oversight, that it instituted this administrative investigation that is under review here. It was in order, and it said, even in its title, and it ordered it to address issues such as the cost, the scope, and the schedule of that program. And it ordered People's Gas to provide a long-term plan, supported by expert testimony. And in that plan, it gave an end date for its program between the years 2035 to 2040, and it gave what would be an annual pace of spending of $300 million per year. Do you have a theory as to why 220.3 sunsets? They just – the theory is they just wanted to provide the rider for a set amount of time and then reassess the situation probably later. I don't know. They just didn't want to provide – the General Assembly provide a permanent rider. However, that doesn't provide a reason for statutory construction. Why 220.3 would have divested the commission of its regular and ordinary authority to ensure just and reasonable rates. That's – their argument is that this is – So there are two parts to 220.3. Is that right? Part of it – one part deals with regular rate-making, per se, and the other part of it deals with this modernization piece? Or am I misreading it? I'm not sure if it's – no, Your Honor, it's not two parts. It does – what it covers is it has qualifying infrastructure plans is what it covers, the costs associated with them, and it has seven categories. Only one of those categories is actually replacing the mains, and that's what I think you're – there are others. People's Gas has brought into its S&P program other of those top – other of those areas into it. It doesn't cover all of them, all seven of them. But there are – yes, the – what's QIP? Sorry to keep – the QIP is broader than the program. It's the replacement of mains or the S&P. But that is what gets us to the question. We – below the attorney general opposed that $300 million piece of spending and asked the court – sorry, asked the commission to modify it. It asked it to modify it because it believed the public safety concerns raised by People's Gas's mains didn't require the profound impact that that piece of spending was going to have on affordability of its future services and rights. The commission, however, rejected that argument not based on a merits analysis, but because it concluded it doesn't have the authority under 220, that 220.3 that removed it from the purview of Section 501 and doesn't allow it to change under its other authority to reduce or otherwise change its expenditures on those – that QIP, on those qualifying costs under the rider – sorry, under Section 220.3. And that's the statutory question. They don't – the commission certainly doesn't argue that every rider precludes the commission from exercising its regular authority to ensure just and reasonable rates or to consider whether or not they will result in affordable rates. They say that this one, this specific rider doesn't. They do it – they said so based on the fact – they argued because it has the rate recovery cap, because what makes this one different from other riders is it has a ceiling. But a ceiling is not a guarantee. A ceiling is a limitation on the utility and what it can recover through the surcharge. The surcharge, like under 220.3, is like the other rider surcharges. What it gives it is a timing mechanism. It gives the utility the ability to immediately recover the cost associated with a specific area. Here are the qualifying infrastructure projects. Instead of having to go back periodically through a general rate case and litigate and increase its rates, creating a new tariff based on it, it does it. It gets a monthly surcharge. It is subject, like every other rider, to a reconciliation proceeding after the fact, which is a one sort of – a one-year retrospective accounting analysis to make sure the costs are accurate and that they're prudent. And through that procedure, they are able to immediately get the costs for whatever the project is. So they initially had hearings. They had the staff have the hearings. And there initially was in the plan just this less than a monthly review. Is that right? They were coming back annually or twice a year, and the commission decided upon re-hearing that they would need to come back monthly instead? For their month, they do have to come back monthly in order to submit their charges. Whatever the surcharge, it's a process under the 220.3. That is what they – they do go through that. So I'm not sure if I understand the question. Well, I guess I'm just trying to get at the concern with respect to the cost, because it would seem to me that the investment for what they would be able to surcharge is they would be able to pass on to the client. The commission would have some ability to review what the cost for the modernization plan would be more frequently as opposed to biannually or annually. The review – there's a review, the annual review and reconciliation with all riders. The reason that the commission instituted this one is because, unlike with other riders, the costs were ballooning so much, and there was so much concern about the scope of the costs associated with the program. And that's what 501 is for. That's what Section 501 in Article 8 is for. It's to look at the services, the operations that the utility is providing, and analyze, providing a perspective analysis, looking to the future, what would those costs be? And that was the analysis the Attorney General provided. It was looking at the cumulative effect of those surcharges as they grew over time, got wrapped back into the general rate base on the affordability of people's gas consumers in Chicago. So that authority is there. The only thing – the only – the argument that the commission, People's Gas, make is that this – the rate recovery provision, the cap, is what stops them from – is what divests the – I'm sorry, but it does remove that authority, which is usually there provided under 501 and under other provisions, too, under Section 102 of Article 1. It's the general purpose of the Act in order to ensure affordability under Sections 101 and 201 of Article 9. It's a prohibition against unjust and unreasonable rates. So the authority is there, but they said that simply by providing a cap, a limitation on what the utility can provide, that that somehow guarantees any surcharge underneath that cap. But there's nothing in the language which would be – implies any sort of guarantee or entitlement for the utility. Subsection G is what really provides the cap, and all it says is that the surcharge – the amount of the surcharge shall not exceed – quote, shall not exceed, unquote, the specified percentages. It's usually 4 percent, average since the last general rate case. Section D – Section D is what imposes the restrictions, the commitments of the utility, in order to recover through the right of surcharge. And under D3, that covers the rate – where they recover the rates. And so all that does is it incorporates the limitation of G, that ceiling, on the amount, and says that if it's under that limitation, it is, quote, eligible for recovery, unquote. So I'm looking at what I think is Section 8501, and I'm trying to find language in there with respect to rates. It doesn't explicitly refer to rates in 501, Your Honor. It's looking at the services. Are the services, are the practices, are the operations unjust and unreasonable, and how can you fix them to make them just or reasonable? But isn't that how you get to your position that 220.3 permits or gives grants authority to the commission to control the cost of the S&P? Well, it's how we – that's – it is through 501, and through its control over the just and reasonable services and practices, that we do think it does have the authority to do that. It does also have that general authority to ensure affordable rates. That's what just and reasonable services are. We cite, in quote, from the cases like the Sheffler v. ComEd case, which looked at – was the fundamental purpose of the act, of the commission, its authority to control the affordability of rates. Other cases like the First District's Bloom Township high school case, it recognized that as well. But it is true. It doesn't specifically – it doesn't explicitly refer to rates, but that is part of what – that is implicit in just and reasonable services, is that they will result in affordable rates, Your Honor. Does 220.3 reference 501 at all? It doesn't, Your Honor. It doesn't refer to 501 at all. It doesn't try to carve out any exception. It doesn't use the language which you usually use, the General Assembly uses in other statutes and in the Public Utilities Act when it wants to carve out an exception to a prior statute and particularly wants to partially repeal some sort of prior authority or jurisdiction. That is, notwithstanding – would be, for instance, notwithstanding the court – sorry, the commission's powers or authority under Section 501. You can see that in the other – one of the other statutory riders, Section 220, which covers fuel-adjusted cost limits, certain of the sub-provisions start off notwithstanding the provisions of Section 201, which is one of the provisions which requires just and reasonable rates. We can see it also in the – in Article 8, in Section 103B, which addresses energy efficiency measures, which is a whole other program with a special recovery of costs, in the subsections that which look into the cost recovery programs they begin, notwithstanding any other provision of law. They didn't use any of that language here in 220.3. They did the opposite, if anything. What they did do is, in Subsection E, which covers the review of the – of the surcharge, there in Subsection E1, they said, when they're saying that the surcharge will become effective each month, it first said, unless otherwise ordered by the commission, which – which acknowledges the commission's regular authority remains intact. Nothing about this is divesting or limiting the commission's other authority. The – the commission, however, here, wants to read this one – this one specially, based on that – on that language – sorry, on that cap. They want to say that, by providing a ceiling to General Assembly, basically intended to foreclose the commission from looking at affordability at all. The – but none – as I explained, none of the language is used that is usually – to carve out an exception, like notwithstanding. There's no mandatory language, which, again, the General Assembly usually uses, like Schitt's, saying that the utility shall recover costs. We see that in other sections of the Public Utilities Act, where it says that the utility – that is – actually, I believe in 103B, the subsection says that it's the General Assembly's – the intent of the General Assembly that the utility shall recover all costs associated with that subsection. But we don't get any of that kind of language. Instead, all we have under subsection D3 in this rider provision is that, if they're under the ceiling, they're eligible for recovery, and they can recover it. That's permissive language. It's not the mandatory language. The commission also then argues that somehow that provision, D3, is deeming all – deems any surcharge below reasonable – just and reasonable. It doesn't point to any language, and, again, the General Assembly has used that language in other provisions of the Public Utilities Act, where it's deemed certain sort of – it's in 103B again. It deemed certain capital structures associated with the programs in that reasonable for purposes of setting rates. There is another provision. I believe it's – sorry. Oh, it's Section 220, where it deems reasonable in subsections H2 and H10 of 220. Again, another statutory rider, the one covering fuel adjustment costs, it deemed reasonable certain state credits in a subsection. It deemed reasonable certain contract costs. So the General Assembly knows how to both carve out exceptions and to create a mandatory recovery regardless of the commission's other authority when it wants to. It gave no indication it was doing so here. Otherwise, the people's gas and the commission rely heavily on the reconciliation proceedings as somehow implying or suggesting that the commission doesn't have the authority to exercise – basically to address or ensure affordable rates in any other proceeding, such as a 501 proceeding. It's a little unclear how or why the reconciliation proceeding is used with every rider, every statutory rider, every non-statutory rider. The fact that anything is addressed in the reconciliation proceeding would not provide any sort of, as I know, statutory construction argument that the commission can't address that same subject matter anywhere. But regardless, as they also acknowledge in their briefs, the reconciliation proceeding is not designed to address the affordability of costs. As I referenced before – But wouldn't that impact the level of costs that they could, in fact, pass on to a consumer? It does, Your Honor. It does still – Well, it does reach it. It's what? It does reach that. I mean, you said it – But it's not designed to address affordability concerns. What it looks at is – it looks at whether or not they actually incurred the costs, they said. It looks at whether they were qualifying, whether they fit under the rider provision of the statute. And it looks at whether they're prudent, which is a reasonable test, but it's not a reasonable test looking at affordability, and especially particularly long-term affordability concerns. It's just a prudence is, is it serving consumer demand? Was it cost-effective when it was created and the execution of creating it? It's not about whether or not you actually – I think the way the commission put it was, whether or not you undertake the costs at all, the project at all. That's not what prudency is about. And you can see from the design of reconciliation, it just looks backwards in time for a one-year period as opposed to 501. The whole point of 501 is a perspective analysis of the impact over time. What is going to be the effect on consumers over time? One of those important aspects of the 501 proceeding would be affordability. How will these affect the affordability of rates? And that is why we're asking this court – we're not asking this court to address that question itself. We're asking the court just to remand it so that the commission will address that question and address that principle challenge we have to the proposed SMP. Otherwise, I see that my time is almost up. Unless you have any further questions, I'd like to just save whatever time left for rebuttal. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Tom Stanton. That's a recorder, not a – it's not a mic. Okay. Just so you know. Okay. So you get to speak. Thank you. Of course, if you don't want to – It's okay. Respondents have divided their time. The 15 minutes that we have, I'm going to take 10 minutes to discuss the matters presented in the commission's brief. And then James Goldschmidt, on behalf of People's Gas, he'll take the remaining five minutes and discuss the matters that People's Gas presented in their brief. So the commission exercised its statutory authority to approve People's Gas' SMP. It found that the SMP, the System Modernization Program, prioritizes public safety and reliability. Now, as evidenced by the order, the commission resolved disputed issues with respect to the scope, the planning periods, the implementation, the pace. On appeal, the AG doesn't challenge our authority to enter those decisions. Or challenge the substantive decisions relating to that. The commission also addressed affordability. It found that it needed to closely monitor the affordability, the rate impacts, and the affordability going forward. Because during the proceeding, heard evidence based on forecast, anticipated forecast, based on assumptions. And the commission determined that we're going to use real-life data. We're going to use real data. So the commission ordered People's Gas to file up quarterly reports, and the commission would evaluate them on rate metrics. So we know the impact, the rates, in each year going forward, the SMP. The SMP is going to last between 2035 and 2040. So the commission addressed the affordability issue, and so we're going to monitor. The commission could always revisit the SMP if need be. But the only challenge that the Attorney General makes to the commission's order is when the commission determined that it lacked authority to impose up-front limits on People's Gas's annual SMP in this proceeding, just an investigation of the SMP. So how did the commission reach that conclusion? 9220.3. 9220.3 establishes a comprehensive surcharge scheme that authorizes People's Gas and other large utilities that qualify to make qualifying investments and then recover the prudently incurred cost of those investments through a monthly surcharge on the customer's bill. And by design, the SMP investments, they're qualifying investments. So on appeal, the Attorney General seems to attempt to override, circumvent that surcharge scheme. How does it do it? It misreads Section 9220.3 as imposing only a cap on People's Gas's recovery through the surcharge. That section specifically authorizes People's Gas to recover its cost, those qualifying investment costs, through the surcharge, and then it caps that recovery each year. How do we know that? First sentence of subsection D3, first clause, authorizes within the conditions, it has to be the lesser of those two conditions, but it's nevertheless an open-ended, unlimited recovery under the first clause. Second clause is the cap. You can look at the statute. First clause, comma, quote, and subject to the limitation of subsection G. In this section, that's the cap. So the commission was limited. It couldn't simply just impose these up-front limits, right, these up-front limits on People's Gas, on their spending, this annual spending amount, right? So a statute should be read as a whole, construed to give effect to every word, clause, and sentence. So because the attorney's general reading fails to give independent effect to that first clause, the authorization, and that authorization, and like I said, it's unlimited, open-ended, the more investment People's Gas makes, again, has to satisfy those two conditions, right, qualifying investment, placement, service, the lesser of, and then the other one is the difference between the total plant additions, right, and the baseline amount. We know what the baseline amount is. That's the $57.5 million. But each investment they make, if they make a qualifying investment, that first condition goes up. See, it's also a plant addition. Plant addition is the general category. Qualifying investment is the subset. So that authorization, or that investment can go as an unlimited recovery. What the cap does, the cap caps that, 4% annual average, right, the amount built, or 5.5% in any particular year. So it's the cap. It's the general authorization, and then the cap. So that's why the commission couldn't impose those up-front limits. The statute itself authorizes People's Gas to recover between those minimum and maximum limits. The first clause is the minimum limit. They have to reach that hurdle, that $57.5 million, before they can recover anything through the surcharge. And then there's the cap. That's the 9220.3G. That's the cap. So the commission's, or the attorney general's wrong that People's Gas has to recover all of its costs, right, all of the S&P costs below the cap. It talks about the first limit. The first limit is that minimum hurdle. They have to get over that each year before they're entitled to anything, even the qualifying investment costs. If they don't reach that hurdle, they're not entitled to anything. The other limit, the commission, the cost must be prudently incurred. The commission determines the prudency of those costs in the annual reconciliation. That's in the calendar year after the calendar year that the company makes the investment. So People's Gas is making the investment throughout the year, January, February, March, April, through the year. Once they get done, they're recovering those investment costs as they're making them. That's E1, section E1. So the commission looks in that annual reconciliation at the prudency of the costs. What does the commission look at? Well, say in a particular project, was there an RFP sent out, a request for proposal to vendors? Was there competitive bidding? How was the vendor selected? Let's look at that. Were there cost rubbers? Were they just? Wouldn't that have been something to look at in the initial presentation of the plan, as opposed to at the point of reconciliation? Sure. Well, that's the way the statute is set up. The legislature created this preferential cost recovery. Ordinarily, if the surcharge scheme was not enacted, People's Gas would make these investments. And they would seek to recover those costs in a traditional general rate case. In that traditional general rate case, the commission would determine the just and reasonable. The commission would have all the powers, broad rate making discretion. But the surcharge scheme restricts the commission's powers. The commission is to enforce the limits of the statute. And then the commission does the prudence review at the very end, determines whether they were prudent or not. So the statute itself authorizes the boundaries of the minimum and maximum of the statute. The statute itself, the surcharge scheme, authorizes these investments. So by operation of the surcharge scheme, the amount that's produced, the ultimate surcharge amount, right, after the commission has looked at it, after the commission has made that prudency review and determined that, yes, the cost is reasonable the way you made it, it's prudent the way you made it, the statute itself authorizes that dollar amount for that particular year. So by operation of the statute itself, it deems it reasonable after the commission has looked at the prudency of those costs. Also, the commission's review under Section 220.3E1 and E2 is different. Section E1 is a preliminary review by the staff of the commission. So each month, people's gas files an information sheet. What's an information sheet? An information sheet is defined in our rules. It's defined in the brighter QIP. It's a tariff sheet that initiates or modifies a surcharge adjustment. So the surcharge adjustment that's charged each month to customers fluctuates. So there's a formula in the tariff, a formula in our rules. And so people's gas is required under the statute to provide the information on those qualifying investments that it made and calculate the surcharge. Our staff looks at that, looks to see if it's calculated. And unless the commission otherwise orders, it's the surcharge that goes into effect. The attorney general wants to incorporate the back and forth that unless otherwise ordered by the commission, the commission's general rate powers. That's not what that does. That's just a preliminary review. The initial calendar year is, say, 2018. People's gas will be making investments, and they're authorized to recover them the following month. So that's where that information sheet is. It works within the context of the tariffing scheme. So in the annual reconciliation, that's in E2. And that's where the commission makes the final determination. As I mentioned before, it determines the reasonableness, whether those costs were truly incurred, whether they were reasonably incurred. And the final number, the commission trues up what people's gas billed during that calendar year. It determines what the actual amount is that they're entitled to recover. They true it up. If there's an overbilling, the surcharge is adjusted going forward to refund to customers. And the same thing if there's an underbilling. So turning to Section 8501, that's their argument. They want to use 8501 to use the commission's general regulatory authority to impose these limits up front, contrary to the surcharge scheme. But even assuming that people's gas is S&P, spending amount, is a practice or a service within the meaning of Section 8501, that practice or service is authorized by Section 9220.3. Remember, the minimum, the maximum, they're entitled to recover those costs between the authorization of that first clause of the first sentence and the cap. So it's not simply just a cap. It's an authorization and then the cap. So the commission read Section 9220.3 and Section 8501 in harmony. It determined that Section 8501 doesn't authorize the commission to forbid people's gas, right, from doing what Section 9220.3 authorizes the people's gas to do, namely make those investments and then recover the cost of those investments, again, between the minimum and the maximum amounts through that surcharge. And just as Kyle, you mentioned, does the commission get to review those costs? And as I mentioned, that's in the annual reconciliation. The commission reviews the reasonableness and the prudency of the costs that people's gas makes in the calendar year. Again, we do that after the fact in that annual reconciliation. So there is a commission review of that, and the commission can disallow costs. Like I said, the commission can look at the prudency and if, say, $20 million is eligible, it's otherwise eligible to be recovered through the surcharge scheme because it satisfies the qualifying investment. It's a qualifying investment. It's above the minimum. It's beneath the maximum, beneath the cap. Nevertheless, the commission could still determine that $20 million, maybe $5 million of that was imprudently incurred, was not reasonably incurred. The only amount to be retitled to that surcharge is $15 million. The imprudent amount they can't recover from rate payers through that surcharge. And just as Kyle, you're absolutely right. 8501, all of Article 8, applies to services. This was not a rate-making case. The Attorney General in the brief admitted that this proceeding here, review the S&P, to determine whether it was necessary to have programs, practices change, portions of the S&P. Services, not rate-making. Rate-making case, Article 9, that's not this case. So, like I said, the commission, the primary focus of the S&P, is to remove this at-risk, aging, vintage pipe, People's Gas Hazardous Network in the city of Chicago and the delivery system. It's been the cause of leaps, explosions in the Northeast, Harlem, explosion. Eight people killed, dozens injured, Allentown, Philadelphia. All right, so this is, that's the primary focus. The commission said, of paramount importance, that we remove this pipe sooner rather than later. The commission did balance. The commission balanced the safety, reliability, paramount focus. But the commission balanced affordability, efficiency, customer satisfaction. Commission adopted a neighborhood approach. One of the reasons the AG's plan would have gone into different neighborhoods at different times, dug up the streets, closed them up, dug up the streets again a year later. To do the other work, too, the commission adopted People's Gas's proposal. It's more efficient. Go into a neighborhood, do all the work at once. Rank the neighborhoods. A rolling three-year plan. Each year, it's reassessed to determine which neighborhood's riskiest or have a list of neighborhoods. Go to those neighborhoods. Remove the pipe. Relocate the meters from inside the customer premise to outside the customer premise. Safety and reliability issue. If People's Gas employee needs to get to that house to stop a leak, custom your meter on the outside. Fire department, same thing. Don't have to locate the customer. Don't have to locate the meter inside. Safety, reliability. But I don't think anybody's complaining about the substance of the plan. I think the complaint is that there was not the necessary testing of the cost of the plan at the outset. I don't hear the AG's argument or understand their argument to suggest that there's something problematic substantively about the plan at all. It's just that they anticipate or they believe that statute would authorize you to make a determination about the reasonableness of the cost up front. Right, and that's, again, getting back to that surcharge scheme, 1920.3. Their argument fundamentally misreads the act, and that's the basis of their argument that the commission can use 8501 to impose these up-front limits. They argue that there's only a cap. It's like we talked about today. There's an authorization and a cap. The legislature decided that. The commission can't add or subtract what types of investments listed in subsection B. Those are all the qualifying investments. And the commission can't change, alter the amount that's eligible to be recovered through subsection B other than in that prudence review, that annual reconciliation. That's the commission's opportunity to review that. Why did the legislature do that? They balanced. They want people's gas to accelerate the removal of the pipe and do this other work. They want to accelerate that. That's why they adopted this cost recovery mechanism. It's not traditional. The traditional mechanism is that they make investments that come in for a traditional rate base. This is different. The legislature, as I said, restricted the commission's discretion, the authority, what we can do, and itself, the legislature itself established the terms and conditions of the statute. Just one other thing. Council mentioned the annual reconciliation. We've never argued that the annual reconciliation replaces the commission's authority to regulate gas operations. The commission's authority to ensure affordable rates. It doesn't. The commission still has that authority. It's just with respect to this surcharge scheme, which will sunset unless things are changed, 2023. The S&P will continue on. At that point, people's gas will have to revert back to that traditional model where they make the investment and if they want to recover the cost of that investment, file a general rate increase in the commission, and at that point, the surcharge scheme is gone, the commission will have its broad rate-making powers discretion. The commission could reevaluate the S&P at that point. But because the surcharge scheme is in effect, the commission can't avoid it. The commission has to abide by it. So I would just ask the court to affirm the commission's order. Thank you very much. Thank you. Good afternoon. James Wolschmidt for People's Gas. It's late in the session, so I'll do my best to be brief, tracking our brief brief, which you may have noticed is shorter than everyone else's. That's because we see the issue slightly differently than the other two parties that have argued so far, but it's a shorter path to the same result as the one urged by the commission. The argument so far has focused on this question of statutory interpretation. How does Section 9-220.3 interact with the commission's broader authority under Section 8-501 and vice versa? The court can reach that issue if it wishes to, interpret those two statutes and reach a conclusion about their interaction with each other. But our position is there's no need to get there because the sole error that the AG has alleged in this appeal, and the only basis for reversal that they've presented to this court, is that somewhere along the way in this 211-page masterpiece of a decision, the commission lost its way and lost sight of the authority that it has under the Article 8 of the Act and abandoned that authority because of something in Section 9-220.3. Our view is the commission did not do that, and we can see that on page 157 to 158 of their opinion. That's pages 207 to 208 of the appendix. Now, the question that the commission is answering in this portion of its opinion is, does Section 9-220.3 preclude the commission's authority to determine the scope, design, schedule, cost, and other issues related to an infrastructure project mandated under Sections 8-501 or 8-503? That's this question. And when the commission gets around to answering that question after rehashing everyone's positions for 20 pages of its opinion, we get to page 157 of the decision. At the bottom of that page, the commission says, staff claims that the commission cannot legally limit People's Gas's maximum periodic recovery of S&P costs under Rider QIP to levels below those authorized by the cap defined in Section 9-220.3 of the Public Utilities Act. The commission agrees. We can't change that cap. However, the commission does have the right to make determinations concerning the cost recovery in People's Gas's annual QIP reconciliation proceeding. That's the backstop. And this is the critical piece. The commission also retains its authority to approve or to modify infrastructure investment plans using its Article 8 authority. Functional effects of otherwise commissioned determinations may reduce the amount properly recovered through QIP surcharges, but such effects do not violate Section 9-220.3. That is the commission saying, we recognize our broader authority. We can control the scope and pace of the proceeding. We exercise that authority here, and doing it doesn't violate Section 9-220.3. That means the commission did not make the conclusion that the AG says they did. And if they didn't make that conclusion, then the court does not need to reach the question of how those two sections interact because the AG and the commission agree about the powers that they have. I don't know if I agree with that. Judge Cobbs, you asked, doesn't it make sense? I'm not sure we can sit in there. Justice Cobbs, you asked, wouldn't it make sense for the commission to review the scope and pace of the program up front rather than in a reconciliation proceeding? The answer is yes, and that's what the commission did. That's what this decision is. This 211-page decision is the commission painstakingly reviewing each party's proposal about the scope of the program, the pace of the work, selecting from among alternatives based on policy reasons articulated based on facts in the record. And the AG doesn't challenge any of that. So it would be impossible to read this decision and conclude that the commission somehow believed it lacked authority to do what it spent 211 pages doing. The only thing the commission concluded it lacked authority to do was change the cap set by the legislature on the spending for the program. If you look at the AG's briefs, you'll see this common formulation that the commission concluded that it lacked authority to modify the scope, pace, or annual spending of the SMP. That elides two decisions that the commission made. It concluded it couldn't touch the annual spending. It couldn't change that cap. But it did not conclude that it couldn't touch the scope or the pace. And that distinction matters because if the commission didn't conclude that, again, it did not commit the error that the AG alleges, and there's no basis for reversal. The only other point that I would like to mention, and it's another one brought up by a question from Justice Cobbs, is do we have a theory about why Section 220.3 sunsets? Why did the legislature do that? I would submit it's for the same reason that department stores announce limited time sales. They want people to get in there and spend some money. They saw a problem here, and they decided that the paramount reliability and public safety concerns that led the legislature to adopt this rider QIP, and, by the way, led the commission to reject the AG's lower, slower plan, are controlling facts. And the fact is those are also facts that won't change on remand. All of the policy decisions and all of the facts on the ground about the need for this program and the alternative presented by the AG will all be the same if this gets sent back to the commission. And so if the error alleged is really about that the commission was somehow confused about its authority, I think we've demonstrated that they weren't, but we know the decision they reached on scope and pace regardless of what they did with the cap. And I don't think anyone really disputes that the commission can set a different cap than the one that the legislature set. In fact, if we look at page 21 of our brief, people's gases brief, we cite the concession that the AG made in phase two of the proceeding. The commission may not possess the authority to impose a rate cap lower than the section 9-220.3G caps. So there's two different things going on here, the cap and the scope and pace of the program. The commission correctly concluded that it can't touch the former, but it did not conclude that it can't touch the latter, and, in fact, that's what its entire decision is an exercise in discretion doing. For those reasons, we would ask the court to affirm the decision of the commission, and that's all I have unless you have any questions for me. Thank you. Thank you. Thank you, Your Honors. I'll try to be brief. With regard to people gases arguments, obviously we disagree, and apparently also the commission disagrees. While there are certainly issues of scope and pace that the commission did address, they did not address how affordability affected them and whether or not based on the profound impact on affordability when balanced against the public safety needs, whether or not in that place they should modify the pace and scope. That's what they never did. Over and over again, they said they could not reduce the amount of the commission's expenditures. Yes, they viewed any order that would limit the operations, limit the spending, not the rates, limit the spending on the program by people's gas would somehow be tantamount to another rate cap, but it's not. It doesn't do the same thing as the rate cap. The rate cap in section 220.3 sets an absolute cap regardless of any considerations, regardless of public safety, regardless of affordability, reliability. You can't, the utility cannot recover more than that in a given year through the surcharge. However, below that cap, what we're asking, what we asked below the commission to do was specifically to exercise its authority under 501 to look at those factors, to consider those factors, specifically look at public safety, look at affordability, balance those factors based on their factual assessment of the risks, the safety risks being raised by public, sorry, by people's gases means, how they could be addressed by their SMP program and the impact of people's gases program on its consumers. And the commission didn't do it. We've just heard argument from the commission that they felt they couldn't do it. They were divested of that authority. They did not have authority specifically because of the surcharge and because of that rate recovery cap. Going back to the statute, the rate recovery provision, that's subsection D3, general authorization, it's a limitation. Section D in general is providing limitations and obligations on the utility in order to recover. So what does it say? It says the amount of qualifying infrastructure investment eligible for recovery under the tariff is limited to, and then it gives the limits. That's that general authorization. That is not a mandate that it, a mandate that it must, that the utility must recover all those amounts through the surcharge regardless of the commission's other authority and other findings it may have on the justness or the reasonableness of those operations. They also mention a minimum cap. Just so you know, that's not a minimum. The minimum limitation in D3 is not a minimum amount of qualifying costs. It's not saying you have to make a certain number of qualifying costs. It's a minimum number of total plant additions. And what that is about is it's not about trying to get them to spend as much on the S&P or on the qualifying costs. It's making sure they're not using those qualifying costs as essentially a substitute, just basically making all of their plant additions under the QIP and foregoing the regular additions. So it basically says you have to make a total plant additions equal to what was an average depreciation from a prior historical period, what you would expect you to be doing in your regular maintenance and taking care of your infrastructure. Once you've reached, as long as you've reached that generally, however you get to it, any amount above that you can get, then allows you to get through the QIP rider. Otherwise, the reconciliation, again, we just, they seem to, the commission still seems to be relying on it. They say that, no, they're not relying on it in order to somehow divest or limit the commission's authority, but they're saying, that's exactly what they're saying is they want to limit, they want to use the reconciliation to limit the commission's authority with regard to qualifying projects. That is, that they're saying that you can't, but because you have this one-year retrospective accounting exercise, which is provided for every single rider, that somehow that means that the commission can't exercise its normal authority under 501 to, over there, to ensure that they're just and reasonable services, gas services and operations. And that's all that we're asking. That's what we asked below, and what the relief we're trying to seek before the commission, not here, is just that under 501, the limitation on those services, that is, the limitation on services is just a limitation on the pace of the spending. It's not a rate cap. It will, the reason we're asking for it, one of the, has to do with the impact on rates and the impact on the affordability of those services, but it is not tantamount to the recovery cap. It's the commission doing exactly what it does all the time, what it is expert in doing, and what we all rely on them to do in order to ensure that public utilities such as gas, heat is available to all the consumers in Illinois. Unless there's any more questions, Your Honor, we ask that you reverse the commission's order below and remand it, find that it does have the authority to address and to modify the pace and scope of the program below based on, to ensure both safe and affordable rates and remand this action, sorry, to the commission in order to exercise that authority. Thank you. Interesting. Actually, what you guys explained is a lot better than reading the briefs. It makes a lot more common sense. Thank you.